Christine Salmi, Bar No. 5626
CSalmi@perkinscoie.com
William K. Miller, Bar No. 10755
WMiller@perkinscoie.com
PERKINS COIE LLP
1111 West Jefferson Street, Suite 500
Boise, ID  83702-5391
Telephone:  208.343.3434
Facsimile:  208.343.3232

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NAVEX GLOBAL, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> RICHARD A. STOCKWELL, JR., <br><br> *Defendant.* | Case No. <br><br> **VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF** |

## INTRODUCTION

Plaintiff NAVEX Global, Inc. ("NAVEX") brings this action for injunctive relief against Defendant Richard A. Stockwell, Jr. ("Stockwell") for breach of contract.  Until September 24, 2019, Stockwell was a Senior Sales Executive at NAVEX, in charge of selling NAVEX's risk and compliance "software as a service" ("SaaS") solutions to customers and managing customer relationships.  As a Senior Sales Executive, Stockwell helped develop and execute NAVEX's short- and long-term sales strategies and had access to and intimate understanding of NAVEX's most confidential and proprietary information, including sales and marketing strategies, current and future product plans, pricing structures and contract terms, and customer and prospect names and contact information.  As a condition of his employment with NAVEX, Stockwell executed a Confidentiality, Invention Assignment, Non-Compete and Arbitration Agreement (the "Agreement") which contains post-employment nonsolicitation and noncompetition provisions.

**VERIFIED COMPLAINT
FOR INJUNCTIVE RELIEF - 1**
145821030.3

Now, in direct violation of his Agreement with NAVEX, Stockwell has accepted employment as a Sales Director for Whispli, NAVEX's direct competitor in the business of ethics reporting and compliance.

NAVEX alleges as follows:

## PARTIES

1. NAVEX is a Delaware corporation with its principal place of business in Lake Oswego, Oregon.

2. Stockwell is an individual who, upon information and belief, is residing in Madison County, Idaho.  Until September 24, 2019, Stockwell worked for NAVEX as a Senior Sales Executive.  Stockwell has accepted employment with Whispli, NAVEX's direct competitor, as a Sales Director.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action based on 28 U.S.C. § 1332(a). Diversity jurisdiction exists because complete diversity exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b)(1) because, upon information and belief, Stockwell lives in Madison County, Idaho.  Venue is also proper in this District because in the Agreement Stockwell consented to venue in this District.

## FACTS AND BACKGROUND

**A.   NAVEX Carefully Safeguards Its Proprietary Information**

5. NAVEX is a leading provider of SaaS risk and compliance solutions which help organizations ensure ethical and legal compliance.  One of NAVEX's software solutions, called "EthicsPoint Incident Management," provides corporate customers with access to an online platform through which the customer's employees can securely and anonymously report whistleblower complaints.

6. Due to the nature of its business, NAVEX has developed and owns valuable proprietary information, to which only certain of its employees have access. NAVEX's proprietary information includes (among many other things) the software and algorithms powering its software solutions, plans for current and future software products, pricing structures and contract terms, information about customers and prospective customers, and client and market analyses and strategies. NAVEX's proprietary information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

7. NAVEX goes to great lengths to maintain the confidentiality of its proprietary information. Among other things:

   a. NAVEX restricts its proprietary information from being disclosed to the public.

   b. NAVEX limits disclosure of its proprietary information internally on a need-to-know basis.

   c. NAVEX requires employees and third parties who are given access to its proprietary information to first enter into confidentiality and nondisclosure agreements.

   d. NAVEX requires all employees to read and attest to its Code of Conduct on an annual basis. The Code of Conduct explicitly states that NAVEX employees and third parties working on NAVEX's behalf must "keep the personal and confidential information of our company as well as the confidential information of others safe and secure," "comply with the confidentiality and non-disclosure provisions of the agreement [the employee] signed when hired at NAVEX," "never share the confidential or proprietary information of NAVEX Global, our clients or business partners," "know and follow the terms of [the employee's] confidentiality agreement," and "respect intellectual property." A true and correct copy of NAVEX's Code of Conduct is attached as **Exhibit A.**

**VERIFIED COMPLAINT**
**FOR INJUNCTIVE RELIEF - 3**
145821030.3

  e. NAVEX requires all employees to undergo annual training regarding its Code of Conduct, ethics policies, and matters relating to cybersecurity, privacy, confidentiality, confidentiality agreements, proper electronic communications, leaving employment with NAVEX, and working outside NAVEX.  Stockwell completed online trainings related to the Code of Conduct in 2016 and 2018 and read and agreed to abide by the Code of Conduct each year in 2016, 2017, and 2018.  A true and correct copy of a list of NAVEX-required trainings completed by Stockwell and company policies acknowledged by Stockwell during his employment with NAVEX is attached as **Exhibit B**.

  f. NAVEX strictly and consistently enforces the foregoing policies and agreements.  Employees that have disclosed confidential information (including NAVEX's proprietary information and trade secrets) have been consistently disciplined (and in some cases, terminated), and NAVEX has consistently reminded its former employees of their obligations upon leaving NAVEX's employ.  NAVEX has also brought legal action against employees and former employees who have violated its nondisclosure, noncompetition, and nonsolicitation agreements, including as recently as September 2019.

**B. Stockwell's Employment with NAVEX**

  8. Stockwell started working for NAVEX on or about December 5, 2016 as a Senior Sales Executive (AE3), which is the highest-level position for a sales professional at NAVEX. In that position, Stockwell was responsible for selling NAVEX's risk and compliance SaaS solutions to customers in Oregon, Washington, British Columbia, the greater San Jose area, and managing those customer relationships.  At the time of his termination Stockwell was managing approximately 77 customer accounts, which included some of NAVEX's largest accounts.

  9. The typical purchaser of NAVEX's risk and compliance services contracts with a single service provider for all or many of its U.S. or Canadian employees, regardless of where

the employees are physically located.  For example, an employer that makes purchasing decisions in California but has employees in 20 states typically would not set up 20 different ethics reporting hotlines.  That company would set up a single hotline for use across the United States.  Thus, sales of NAVEX's and its competitors' services may extend well beyond the location in which the customer is headquartered or the sales agreement is entered.  Many of Stockwell's customers and prospects purchased, or were proposed, services to be used across multiple U.S. states and/or Canadian provinces.

10. As a Senior Sales Executive, Stockwell was given an annual sales quota that NAVEX does not disclose to the public, as it constitutes confidential and trade secret information, but is well in excess of $75,000.  Stockwell was paid an annual base salary in excess of $75,000, with potential for additional compensation based on commission.

11. In connection with his job as a Senior Sales Executive, Stockwell had access to and regularly used NAVEX's proprietary information including current and future product plans, pricing structures (including discount rates) and contract terms, client lists and prospective client lists (including specific points of contact), and internal client and market analyses and strategies.

12. This information would be extremely valuable to NAVEX's competitors.  Among other things, it can be used to target solicitations and business solutions to specific customers and prospective customers, while simultaneously undercutting NAVEX's confidential marketing efforts and pricing proposals.

13. If NAVEX's proprietary information is improperly disseminated to third parties, it will result in monetary damages as well as harm to business reputation and a loss of goodwill.

C. **Stockwell Agreed Not to Disclose or Use NAVEX's Proprietary Information after His Termination**

14. As a condition of his employment with NAVEX, Stockwell executed the Agreement on November 28, 2016, a true and correct copy of which is attached as **Exhibit C.**

15. By signing the Agreement, Stockwell acknowledged and agreed that his employment with NAVEX created a relationship of confidence and trust with respect to any

proprietary information he received pertaining to NAVEX.  Section 2 of the Agreement defines "Proprietary Information" to include (among other things):

> Internal business information, procedures and policies, including, but not limited to, licensing techniques, vendor names, other vendor information, business plans, financial information, budgets, forecasts, product margins, product costs, service and/or operation manuals and related documentation including drawings, and other such information, whether written or oral, which relates to the way the Group conducts its business or intends to conduct its business;
>
> …
>
> [C]ustomer or prospect sales and marketing information, including but not limited to customer or prospect identity, sales forecasts, marketing and sales promotion plans, product launch plans, sales call reports, competitive intelligence information, customer information, customer lists, customers' needs and buying habits, sales and marketing studies and reports, internal price list, discount matrix, customer data, customer contracts, pricing structures, customer negotiations, customer relations materials, customer service materials, past customers, and the type, quantity and specifications of products purchased, leased or licensed by customers of the Group[.][1]

16. Pursuant to Section 2 of the Agreement, Stockwell specifically "agree[d] to treat and preserve Proprietary Information and materials as strictly confidential."  For the period of his employment with NAVEX, Stockwell agreed to "use and disclose Proprietary Information only for the Group's benefit and in accordance with any restrictions placed on its use or disclosure by the Group."  After termination, Stockwell agreed that he would "not use in any manner or disclose any Proprietary Information."

**D.  Stockwell Agreed Not to Solicit NAVEX's Customers for 18 Months**

17. In Section 7.2 of the Agreement, Stockwell agreed not to solicit NAVEX's suppliers, customers, or prospective customers for a period of 18 months after termination of his employment.  Specifically, the nonsolicitation clause states:

> During your employment with the Company or any Group Company and for [a period of 18 months thereafter], you will not directly or indirectly
>
> (i) solicit or accept from any Customer or Prospect of the Group, any business that is comparable or similar to or otherwise competitive with the existing or intended business of the Group;

---

[1] In the Agreement, the term "Group" refers to NAVEX and its affiliates (whether a parent, subsidiary, or sister entity to the Company) engaged in the same line of business as NAVEX. Agreement at p. 1.

**VERIFIED COMPLAINT**
**FOR INJUNCTIVE RELIEF - 6**
145821030.3

(ii) request, suggest or advise any Customer, Prospect or supplier of the Group to curtail, cancel, or withdraw its business from any Group Company; or

(iii) aid in any way any other entity or person in obtaining business from any Customer or Prospect of the Group that is comparable or similar to any products or services provided by the Group.

18. "Customer" is defined as "any purchaser of Company or Group services or products within the 24 month period prior to any solicitation or other activity prohibited under this Section 7 and about whom one of the following is true: during the term of your employment, (i) you worked on or were connected to such customer's account; (ii) you had contact with the customer as a Company or Group representative; or (iii) about whom you learned or developed Proprietary Information." Agreement § 7.2.

19. "Prospect" is defined as "a potential customer with whom the Company or a Group Company has had business dealings or from whom it has obtained Proprietary Information or has approached the Company or any Group Company or has been approached by the Company or any Group Company for business, provided that the Company or Group Company is engaged in actively pursuing such business within the six months prior to any solicitation or other activity prohibited under this Section 7 and further provided that you were involved in, or possessed knowledge of, the solicitation of such prospect during the term of your employment." Agreement § 7.2.

**E.    Stockwell Agreed Not to Compete with NAVEX for 18 Months**

20. In Section 7.3 of the Agreement, Stockwell agreed not to compete with NAVEX for a period of 18 months after termination of his employment in the geographic area in which he provided services or had a significant presence or influence on behalf of NAVEX. Specifically, the noncompete clause states:

> During your employment with the Company or any Group Company and for a period of eighteen (18) months thereafter (the "***Restricted Period***"), you will not, directly or indirectly, whether as an employee, officer, director, consultant, owner, manager, advisor, investor, or otherwise, in any city or county or geographic area in which you provided services or had a significant presence or influence on behalf of the Company or a Group Company ("***Restricted Area***") (i) render advice or services to, or otherwise assist, any person, association, or entity who is engaged, directly or indirectly, in the Restricted Business . . . or (iii) carry on or

> be in any way engaged, concerned or interested in or have business dealings with the Restricted Business.
>
> …
>
> For the avoidance of doubt, the Restricted Area includes without limitation any particular region or country in which you were involved in providing Restricted Products and any city, county or similar geographic subdivision in which a Customer, as defined in Section 7.2, is located.

21.  "Restricted Business" is defined as "the business of researching into, developing, manufacturing, distributing, selling, supplying or otherwise dealing with Restricted Products."  Agreement § 7.3.

22.  "Restricted Products" is defined as "products or services which are of the same or materially similar kind as the products or services (including but not limited to technical and product support, professional services, technical advice and other customer services) researched into, developed, manufactured, distributed, sold or supplied by the Group and with which you were directly connected during your employment with the Company and/or its predecessor."  Agreement § 7.3.

**F.  Stockwell's Employment with NAVEX's Direct Competitor Violates His Noncompete**

23.  On or about Friday, September 20, 2019, Stockwell informed NAVEX that he intended to leave NAVEX to join Whispli as a Regional Sales Director with responsibility for North and South America.  In response, NAVEX reminded Stockwell of his noncompete obligations to NAVEX.  Stockwell said that he would take the weekend to think about it.

24.  On or about Tuesday, September 24, 2019, Stockwell emailed NAVEX's Vice President of Sales and stated that he intended to resign his position with NAVEX.  NAVEX terminated Stockwell's employment that day.

25.  Stockwell now works or intends imminently to work as a Regional Sales Director for Whispli, which sells products and services that compete directly with NAVEX's similar products and services.  Upon information and belief, Whispli pursues many of the same customers as NAVEX in the ethical, legal, and corporate governance compliance industry.  Stockwell's high-ranking sales position at NAVEX afforded him access to a significant amount

of NAVEX's proprietary information, all which would be extremely relevant to Whispli's business. It would not be possible for Stockwell to perform his new job at Whispli without using NAVEX's proprietary information.

26. Stockwell's LinkedIn page (a true and correct copy of which is attached as **Exhibit D**) provides the following description of Whispli:

> Whispli is the most secure and cost effective, anonymous two-way communication and case management SaaS platform. Our easy-to-use platform lets your people speak up safely and without fear. When employees speak sooner, you identify risks before they are a threat to your organization and its reputation.

27. Stockwell's LinkedIn page provides the following description of NAVEX:

> NAVEX Global's comprehensive suite of ethics and compliance software, content and services helps protect your people, reputation and bottom line. The trusted global leader of integrated software, content and services in the ethics and compliance space, providing governance, risk and compliance (GRC) solutions to more than 12,500 organizations worldwide and 96 of the Fortune 100.

28. As described above, NAVEX's EthicsPoint Incident Management software solution allows company employees to securely and anonymously report compliance issues to their employer online. On information and belief, it performs the same or similar functions as the primary software solution offered by Whispli.

29. Upon information and belief, as Regional Sales Director for Whispli, Stockwell is responsible for customers and prospective customers covering the same geographic regions he covered when he worked for NAVEX.

30. Despite leaving NAVEX to work for a direct competitor in the same product and service line, Stockwell retained his company computer from NAVEX. In accordance with company policy for remote workers, on September 27, 2019, NAVEX provided a FedEx slip to Stockwell to ship his computer back to NAVEX. As of the filing of this complaint, Stockwell's computer has not been received by FedEx for shipment back to NAVEX.

31. After NAVEX learned that Stockwell was going to work for a direct competitor, it performed a search of his NAVEX email and found (among other things) an email dated July 9, 2019, from Jay Webb (a recruiter for Whispli) to Stockwell:

> Your experience at Navex Global makes you a really good candidate for [Whispli].
>
> …
>
> They are a venture-backed start up that offers an enterprise communication platform that enables anonymous internal communications.
>
> Ability to sell into compliance is critical.
>
> You'd be there [sic] only North American sales rep, so there would be plenty of blue ocean for you.

A true and correct copy of that email is attached as **Exhibit E**.

**G.     The Agreement Provides for Injunctive Relief under These Circumstances**

32.     Although the Agreement contains an Arbitration Clause, the Agreement contains a carveout that allows NAVEX to seek injunctive relief for violations of the Agreement's nondisclosure and noncompetition provisions.  *See* Agreement § 10 ("[T]his Agreement shall not limit the Company's right to apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction or similar relief in order to preserve the status quo or prevent irreparable injury . . . ."); Agreement § 11.1 ("[I]n [the event of breach or threatened breach of the nondisclosure and noncompete provisions] the Company will be entitled to apply for temporary restraining order, injunctive relief or other interim or conservatory relief in any state or federal court in the State of Idaho to enforce this Agreement . . . .").

33.     As part of the Agreement, Stockwell expressly acknowledged that, in the event of a breach or threatened breach of the nondisclosure or noncompetition provisions, NAVEX will "suffer immediate and irreparable harm for which there is no adequate remedy at law" and, as a result, is "entitled to apply for temporary restraining order, injunctive relief or other interim or conservatory relief in any state or federal court in the State of Idaho to enforce this Agreement . . . ." Agreement § 11.1.

**FIRST CAUSE OF ACTION**
*Breach of Contract*

34.     NAVEX realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1-33 above.

**VERIFIED COMPLAINT
FOR INJUNCTIVE RELIEF - 10**
145821030.3

35. NAVEX entered into a contract with Stockwell in the form of the Agreement.

36. Stockwell breached the Agreement by rendering advice and/or services to and/or assisting Whispli (NAVEX's direct competitor and a Restricted Business under the Agreement) within the Restricted Area as defined by the Agreement, or agreeing to do so.

37. Stockwell breached the Agreement by carrying on and/or being engaged, concerned or interested in and/or having business dealings with Whispli (NAVEX's direct competitor and a Restricted Business under the Agreement) within the Restricted Area as defined by the Agreement, or agreeing to do so.

38. Stockwell continues to breach the Agreement.

39. Unless Stockwell's unlawful conduct is restrained, it will cause NAVEX to suffer substantial and irreparable injury and damages in excess of $75,000. As a result, NAVEX is entitled to injunctive relief enjoining Stockwell's continued employment and/or other business dealings with Whispli.

## SECOND CAUSE OF ACTION
Misappropriation of Trade Secrets in Violation of the
Idaho Trade Secrets Act (I.C. § 48-801, *et seq.*)

40. During his employment with NAVEX, Stockwell acquired NAVEX's trade secrets, which include (among other things) its plans for current and future software products, pricing structures and contract terms, information about customers and prospective customers, and client and market analyses and strategies.

41. At the time Stockwell acquired NAVEX's trade secrets, he was subject to a duty to maintain their secrecy and limit their use based on the Agreement and other applicable law. NAVEX takes reasonable efforts to maintain the secrecy of its trade secrets.

42. As of the filing of this Complaint, Stockwell has not returned his NAVEX-owned computer on which he stored NAVEX's trade secrets.

43. Stockwell's employment for Whispli, NAVEX's direct competitor, will inevitably lead to the use and/or disclosure of NAVEX's trade secrets (if it has not already), thereby resulting in trade secret misappropriation.

44. Unless Stockwell's unlawful conduct is restrained, it will cause NAVEX to suffer substantial and irreparable injury and damages in excess of $75,000. As a result, NAVEX is entitled to injunctive relief enjoining Stockwell from misappropriating NAVEX's trade secrets, including the return of its computer and any NAVEX trade secrets in his possession and the injunction of his continued employment and/or other business dealings with Whispli, which would lead to the inevitably disclosure of NAVEX's trade secrets.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff NAVEX prays for the following relief:

A. For an order granting injunctive relief, requiring Stockwell to refrain from and immediately cease his employment and/or any other business relationship with Whispli or any other Restricted Business for the shorter of 18 months or until the parties' dispute is resolved on the merits by an arbitrator.

B. For an order requiring Stockwell to immediately return NAVEX's computer and any NAVEX trade secrets in his possession and enjoining, until the parties' dispute is resolved on the merits by an arbitrator, Stockwell's continued employment and/or other business dealings with Whispli, which would lead to the inevitable disclosure of NAVEX's trade secrets.

C. For judgment against Stockwell for NAVEX's costs of suit, including its reasonable attorneys' fees as provided for in accordance with the Agreement, Idaho Code 12-120(3), and other applicable law; and

D. For such other relief as the Court may deem just and proper.

DATED:  October 2, 2019  **PERKINS COIE LLP**

By: */s/ William K. Miller*
  Christine Salmi, Bar No. 5626
  CSalmi@perkinscoie.com
  William K. Miller, Bar No. 10755
  Wmiller@perkinscoie.com
  1111 West Jefferson Street, Suite 500
  Boise, ID  83702-5391
  Telephone:  208.343.3434

*Attorneys for Plaintiff*

**VERIFIED COMPLAINT
FOR INJUNCTIVE RELIEF - 13**
145821030.3

# **VERIFICATION**

STATE OF OREGON)
                     ss.
County of Clackamas)

Shon C. Ramey, being first duly sworn, states:

I am the General Counsel of NAVEX Global, Inc., the Plaintiff in the above captioned action.  I make this verification upon my own personal knowledge of the facts involved.  I have read the foregoing Verified Complaint for Injunctive Relief and, pursuant to 28 U.S.C. § 1745, I verify under penalty of perjury that the factual statements contained within it are, to the best of my knowledge, true and correct.

                                                 _____
                                                   Shon C. Ramey

**VERIFIED COMPLAINT**
 **FOR INJUNCTIVE RELIEF - 14**
145821030.3